563 So.2d 850 (1990)
Ralph LIRETTE
v.
STATE FARM INSURANCE COMPANY.
No. 90-C-0127.
Supreme Court of Louisiana.
June 14, 1990.
Rehearing Denied September 5, 1990.
*851 Joseph L. Waitz and Huntington B. Downer, Jr., Waitz & Downer, Houma, for Ralph Lirette, plaintiff-applicant.
B. Frank Davis and Howard B. Kaplan, Bernard, Cassisa, Saporito & Elliott, Metairie, for State Farm Ins. Co. defendant-respondent.
DENNIS, Justice.[*]
In Canter v. Koehring Co., 283 So.2d 716 (La.1973) and Rosell v. ESCO, 549 So.2d 840 (La.1989), we held that findings by a trial court or a jury of fault and causation of damage in an action brought under Civil Code article 2315 are factual findings that may be overturned on appeal only if they are clearly wrong or manifestly erroneous. See also Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In this case, the Court of Appeal for the First Circuit concluded that there was such readily perceived error in a jury's finding of causation of damage and reversed. Because our review of the record convinces us that our appellate colleagues misapplied *852 the manifest errorclearly wrong standard, we reverse.

Facts and Procedural History
Ralph Lirette, plaintiff herein, and his wife Sharon entertained their friends, Liana Castells and Cary DeRoach in the Lirette's apartment one evening. The four played cards while having Amaretto in the living room until about 10:00 p.m. when Sharon Lirette retired to the bedroom. Lirette followed his wife, leaving Castells and DeRoach in the living room with two blankets. One of the blankets had been manufactured by a Spanish company and purchased from TG & Y. DeRoach left the apartment about 1:00 a.m. and Castells apparently fell asleep with the blanket on the sofa and a lit cigarette in her hand. The cigarette evidently started a fire in the sofa or the blanket. Lirette and his wife were awakened and noticed that their bedroom was full of smoke. Sharon Lirette rushed to the bathroom and opened a window for fresh air. Lirette, on the other hand, opened the door to the living room to see about Castells and was immediately overcome by the smoke, fumes or gases. Castells died as a result of the fire and Lirette suffered serious permanent damage to his lungs. Sharon Lirette escaped without harm.
Lirette filed suit naming State Farm Insurance Co., Liana Castells' insurer, and alleging that Castells' negligence was the cause of his injuries. Subsequently, plaintiff amended his petition to allege that his injuries had been caused by a defective, negligently fabricated or improperly labelled blanket manufactured in Spain. Plaintiff also named as defendants, TAC Industries Marketing, Inc., the distributor of the blanket and TG & Y Stores, the seller of the blanket. Plaintiff alleged that these defendants were negligent and/or strictly liable in failing to determine that the blanket had dangerous propensities and in failing to warn prospective consumers of them.
Prior to a trial on the merits, plaintiff settled with State Farm for the amount of its policy limits and State Farm was voluntarily dismissed from the lawsuit. During the trial, plaintiff was granted a directed verdict in his favor on the issue of contributory negligence. After the trial was completed, the jury returned a verdict in favor of the plaintiff and answered interrogatories finding that Castells, TAC and TG & Y were guilty of negligence that caused plaintiff's injuries. Additionally, the jury found that the blanket was defective and that the defect caused plaintiff's injuries. The jury attributed fault to the defendants in the following percentages: Castells 49%, TAC 28%, and TG & Y 23%. Plaintiff's damages were assessed at a total of $675,000.00. The trial court rendered judgment in accordance with the verdict.
The Court of Appeal reversed solely on the issue of causation, pretermitting all other issues. Lirette v. State Farm Ins. Co., 554 So.2d 1365 (La.App. 1st Cir.1989). We granted plaintiff's writ of certiorari to determine whether the Court of Appeal was correct in concluding that the jury was manifestly erroneous or clearly wrong in finding that the defective blanket caused plaintiff's injuries. Lirette v. State Farm Ins. Co., 558 So.2d 561 (La.1990).

Appellate Review of Fact
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, supra at 844; Canter, supra at 724; Virgil v. American *853 Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987); Boulos v. Morrison, 503 So.2d 1 (La.1987).
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Economy Auto Salvage v. Allstate Ins. Co., 499 So.2d 963 (La.App. 3d Cir.) writ denied, 501 So.2d 199 (La.1986); Thompson v. Tuggle, 486 So.2d 144 (La.App. 3d Cir.) writ denied, 489 So.2d 919 (La.1986); See Graver Tank & Mfg. Co. v. Linde Air Products, Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949); Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395 (D.C.Cir. 1988) cert. denied, ___ U.S. ___, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989); W.S. Shamban & Co. v. Commerce & Industry Ins. Co., 475 F.2d 34 (9th Cir.1973); Hicks v. U.S., 368 F.2d 626 (4th Cir.1966); U.S. v. Springfield, 276 F.2d 798 (5th Cir.1960); Byron v. Gerring Industries, Inc., 328 N.W.2d 819 (N.D.1982); 9 Wright & Miller, Federal Practice and Procedure, § 2586 (1971).

Application of Review Standard by Court of Appeal
Application of the foregoing principles to the conflicting expert testimony and other evidence lays bare the Court of Appeal's error in its employment of the manifest errorclearly wrong standard. The appeals court improperly conducted what amounted to a de novo finding of fact when it disregarded portions of the testimony by the plaintiff's experts and concluded that the jury was manifestly erroneous in rejecting part of the testimony of the defendant's expert.
The Court of Appeal concluded that the plaintiff had failed to prove that the defective blanket caused his lung damage essentially for the same reasons advanced by Mr. Buck, the defendant's textile fire safety engineer. Basically, Mr. Buck testified that the acrylic blanket, upon combustion, would produce toxic hydrogen cyanide gas, which had been ruled out by plaintiff's medical expert as a cause of Lirette's kind of lung damage, but that the blanket, unlike other articles in the living room, could not produce isocyanate gas, which plaintiff's physician had identified as a likely cause of that type of lung disorder. On the other hand, the plaintiff's experts testified that the blanket could produce hydrogen cyanide gas and its derivatives, that isocyanate gas was a hydrogen cyanide derivative, that Lirette's lung damage could result from isocyanate gas or other such hydrogen cyanide derivatives, that Lirette's type of lower air passage damage was not usually experienced by firemen and victims of fires, and that, in scientific testing, material like that in the foreign-manufactured blanket produced an extraordinarily large volume of toxic gases.
Doctor Bernard Brach, Lirette's treating physician, a doctor of medicine specializing in lung disease, was called as a witness for the plaintiff. He testified that in the fire Lirette had suffered permanent damage to his lower air passages; that Lirette had developed tracheomalacia or a softening of these airways which caused them to totally close down when he attempted to blow out; that Lirette had permanently lost 35% of his lung power; that his lungs now behaved as those of a 60 year old instead of those of a 22 year old man such as Lirette. Dr. Brach said that he had treated a couple of dozen people who were caught in fires, including firemen and severe fire victims, and that none of these patients had sustained the unusual damage to their lower air passages that Lirette had experienced.
In assessing the causative factors, Dr. Brach testified that the heat of the fire had not caused Lirette's permanent injury because heat damage is usually dissipated in the upper airways and does not affect the lower air passages. He indicated that the chemical damage or reaction in Lirette's lower lung branches was caused by a toxic or noxious fume capable of penetrating through all the 23 branching passages down to the alveolar sac. Dr. Brach's testimony on this point, which is set forth in the *854 margin,[1] is not free from ambiguity. But he several times stated that, while hydrogen cyanide gases produced by the fire had not caused Lirette's airway disorder, derivatives of hydrogen cyanide probably contributed to the damage. On cross examination, the doctor said that he could find nothing in medical literature that says hydrogen cyanide gas causes airway obstruction, but he testified that "isocyanates," a group of derivatives of hydrogen cyanide "has been more well [sic] described to be associated with airways disease."
Mr. George Pappas, was called as an expert witness in chemical engineering by the plaintiff and accepted as so qualified by the court. Mr. Pappas had performed chemical tests on portions of a blanket[2] identical to the one in question to determine its chemical makeup. He testified that the blanket consisted of acrylic fibers made by polyacrylnitrile. Mr. Pappas further testified that in the chemical test he performed, the material from the blanket, upon combustion, produced both hydrogen cyanide and hydrogen cyanide derivatives.
Doctor Otha John Jacobus, a chemist and professor of chemistry at Tulane University who had received a Ph.D. in chemistry, was called as an expert in chemistry by the plaintiff and accepted by the court. Dr. Jacobus had performed chemical tests on material taken from the identical blanket. He testified that the blanket was made 60% acrylonitrile and 40% acrylic esther. He said that when materials of this type are cooked with heat, but without a fire, they decompose and that one of their major decomposition products is hydrogen cyanide. From a test in which he heated a portion of the blanket's material in a test tube, Doctor Jacobus concluded that the blanket was capable of producing a tremedous load of cyanide in a lethal concentration. He stated that the makeup of the blanket was somewhat strange in that, once ignited, it continued to burn, whereas a blanket made of wool or 100% acrylonitrile is self-extinguishing and will not continue to burn once it is ignited. Dr. Jacobus testified that there are literally hundreds of different *855 acrylics and that unless one analyzes a particular acrylic and determines that it contains acrylonitrile there is no way of knowing that it can produce cyanide.
From our review of the record, we conclude that the jury's decision to credit the testimony of the plaintiff's experts and to reject, in part, the testimony of Mr. Buck, the defendant's expert, was not manifestly erroneous or clearly wrong. The testimony and the reasoning of the plaintiff's experts were not patently unsound. The jury reasonably could have concluded that the defective foreign-manufactured blanket, when baked or burned, produced especially toxic fumes, consisting of both hydrogen cyanide and hydrogen cyanide derivatives, and that the hydrogen cyanide derivatives caused the rare type of chemical damage to Lirette's lower air passages that is not usually encountered in fire victim patients. Insofar as it was inconsistent with this evidence, the jury also reasonably could have rejected the testimony of Mr. Buck, the defendant's only expert, as being less credible. Consequently, the error of the Court of Appeal was its failure to give due regard to the ability of the jury to interpret and discern the credibility of oral testimony. Because of this lapse, the Court of Appeal compounded its error by failing to recognize that there were two permissible views of the evidence and that, when this is so, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Sistler, supra; Rosell, supra.
Defendants also argue that the jury was clearly wrong or manifestly erroneous in finding causation because all of the experts testified that other household items would emit toxic gases upon combustion, and consequently, plaintiff did not prove the toxic gases produced by this particular blanket were the cause of the injury. We disagree. Dr. Brach testified that he had treated numerous victims of household fires, none of whom suffered plaintiff's peculiar injuries. Dr. Jacobus and Mr. Pappas added that this particular blanket was capable of producing a high concentration of lethal gases, which according to Mr. Pappas was not typical of ordinary household items. The jury could have reasonably interpreted this testimony as indicating that the blanket and not other household items caused plaintiff's injury. Any contrary testimony by Mr. Buck could have also been reasonably discredited by the jury, as the choice between the testimony of the experts was for the jury to make.
When a court of appeal has not had the opportunity, or has found it unnecessary to review the merits of the controversy, this court's usual practice, when it becomes necessary to set aside an appeals court's reversal of a trial court judgment, is to remand the case to the court of appeal, even though this court is empowered to dispose of the case finally on writ review. Rosell, supra; Levi v. SLEMCO, 542 So.2d 1081 (La.1989); Richards v. Richards, 408 So.2d 1209 (La.1981); Kavanaugh v. Berkett, 407 So.2d 645 (La.1981). Accordingly, we will reverse the Court of Appeal judgment, but remand the case to the Court of Appeal for it to review the issues not addressed because of its disposition on the sole issue of causation.

Decree
The judgment of the Court of Appeal is reversed and final judgment is entered in favor of plaintiff on the issue of causation. The case is remanded to the Court of Appeal for it to complete its review of the merits of the case consistently with this opinion.
REVERSED; JUDGMENT ON CAUSATION RENDERED; REMANDED TO THE COURT OF APPEAL WITH INSTRUCTIONS.
NOTES
[*] Judge Melvin A. Shortess of the First Circuit Court of Appeal participated in this decision as Associate Justice Pro Tempore.
[1] * * * * *
Now, if you look at fume toxics, the derivatives of cyanide, okay, not hydrogen cyanide, but the derivatives thereof have been shown in laboratories to cause airway diseases, all right. So that we know, okay. From actually different parts of, a different reason. So I'm sure that some of the cyanide derivatives here probably played a role in his airway,
Q In the permanent condition?
A Yes, in airway damage and he scarred, he went ahead and scarred the airway. It's one thing to have it swollen, it's one thing to have it mucus plugged with a lot of secretions; but what he's done now is scar it and he's left with functional impairment because of that.
Q And you heard Mr. Pappas say hydrogen cyanide and its derivative and you say that would be a relationship?
A It is certain derivatives of hydrogen cyanide or cyanide, those have been described, okay, and are documented in some studies done at Tulane and other places.
* * * * * *
On cross examination by defendants, Dr. Brach's testimony with regard to causation is the following:
* * * * * *
Q Will hydrogen cyanide in and of itself, that gas alone, cause the obstruction that you find in Ralph Lirette today?
A I can find nothing in our literature that says hydrogen cyanide gas causes airway obstruction, okay.
* * * * * *
Q And your research shows, however, that in isocyanide cyanadeam I correct, isocyanade derivativeand that can cause the obstructions you find in Mr. Lirette today.
A Let me preface that, the only gas that I have been acknowledged that we talked about as mentioned here is the hydrogen cyanide gas. I am not privileged to any other gases. In our literature, if you look up in books, you have to look in the back and it says "cyanates". And you look up at cyanates, they're going to list hydrogen cyanide, because it's a gas, and then they're going to list isocyanates under that, okay, which to my understanding, is a derivative of that thereof; and then that group has been more well described to be associated with airway disease.
[2] Lirette's grandmother had purchased several blankets for her grandchildren, one of which was identical to the one allegedly causing plaintiff's lung damage. This identical blanket was the subject of the expert testing.